**Opinion issued August 9, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00434-CR

———————————

## ELMER NUNEZ-MARQUEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 240th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 10-DCR-055409**

## O P I N I O N

A jury convicted appellant, Elmer Nunez-Marquez, of the first-degree felony

offense of aggravated robbery and assessed his punishment at fifty-five years'

confinement.[1]  In two issues, appellant contends that the trial court erred in denying his motions to suppress because (1) the arresting officer was outside his jurisdictional boundaries and did not have authority to stop the vehicle in which appellant was riding as a passenger; and (2) the post-arrest show-up identification procedure was impermissibly suggestive and led to a substantial likelihood of misidentification.

We affirm.

## Background

Around 9:00 p.m. on August 16, 2010, a group of men robbed the Qureshi family at their home in Sugar Land.  Afshan Qureshi testified that she lived at the house with her husband, Amar Qureshi, their three children, and Amar's parents. Afshan heard noises outside coming from the backdoor to the house, and she went downstairs to look through the blinds out into her backyard.  As she investigated, the glass in the back door shattered, and six or seven men ran inside the house.  Afshan started screaming and tried to run upstairs, but two or three men grabbed her, tugged her back down the stairs, pulled on her hair, and told her, "We're going to shoot you if you yell and scream."  These men were all holding guns.  Afshan testified that most of the men were wearing jeans or black pants, that some of the men were black

---

[1]      *See* TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011).

2

and others were Hispanic, and that, although they communicated with her in English, she did hear some of the men speaking Spanish.

The robbers gathered the entire family in the master bedroom, cut the phone lines, and tied the hands and feet of all of the family members with the cut cords. The robbers tied Afshan's feet but not her hands because she was holding her six-month-old baby. One of the men, later identified as appellant, remained in the bedroom and guarded the family with a gun. The other men left the room and began ransacking the house. Afshan testified that the man who remained in the master bedroom was wearing a T-shirt with a white logo and a belt with a metal buckle. She spoke with this man at least three times, asking for milk for the baby. This man wore a hat partially pulled down over his face, but the lights were on in the bedroom, and Afshan was still able to see his face. He stood approximately six or seven steps away from her in the room. Afshan testified that the robbers were inside the house for approximately thirty-five to forty minutes, and for most of that time, the family was being guarded in the master bedroom.

Amar testified that he was tied up and was lying face-down on the floor, but he was still able to look to the left and right and see what was happening in the bedroom. He could see the robber who remained in the bedroom out of the corner of his eye. He believed that this man was wearing a black T-shirt and black pants or jeans.

3

After the robbers left, Afshan cut the cords around her feet and then freed the other family members. Amar found his mother's cell phone, which had fallen underneath the bed, and he used that phone to call the Sugar Land Police Department ("SLPD"). Police officers arrived about ten or fifteen minutes later.

In her written statement, made shortly after the officers arrived at the house, Afshan mentioned that some of the robbers were black and some were Hispanic. She did not give a written description of the clothing that the robbers were wearing. Beyond stating that he "could see some of the men wearing black clothing and gloves," Amar also did not describe in his written statement specific articles of clothing worn by the robbers.

SLPD Officer M. Shockey testified that he was on patrol around 10:30 or 10:45 p.m. when he heard the dispatch concerning the robbery at the Qureshi house. Officer Shockey's presence was not requested at the scene of the robbery, so he decided to start looking for the vehicle that the robbers had used to flee. Officer Shockey did not have a vehicle description; all he knew from the dispatch was that suspects were six to eight black or Hispanic males who spoke Spanish. Based on this information, he began looking for one or two vehicles carrying a group of men. Two to three minutes after Officer Shockey heard the dispatch, he started his search on the northbound lanes of the Southwest Freeway in Sugar Land, which he testified was the "most likely escape route."

4

As he drove north on the freeway, Officer Shockey shone his "alley light" into cars that he passed, looking for a group of passengers who matched the description given in the dispatch or displayed other suspicious behavior.[2] Officer Shockey shone his alley light into approximately ten vehicles before he found an SUV with passengers who, he believed, matched the description given in the dispatch. Inside the vehicle were four or five black males who were acting "real nervous." He testified that the passengers in this vehicle remained "very rigid" when he shone his light in the vehicle, that they all continued to face straight forward, and that none of the passengers "would look over at [him] as would a normal citizen look over and try to figure out why [he is] doing this." The driver of the SUV "slowed way down, way below what the posted speed limit is," which caused Officer Shockey to brake so he did not pull ahead. The SUV then pulled back in front of him. At the time Officer Shockey looked in the SUV, approximately five to seven minutes had passed since he had heard the dispatch.

At this point, the vehicles were leaving Sugar Land and entering the city limits of Houston. Because he was leaving his jurisdiction, Officer Shockey consulted with dispatch and decided to keep following the SUV instead of conducting a traffic

---

[2]     Officer Shockey described the "alley light" as a "white light on the side of [his] light bar." He testified that the most common reaction when he shines this light into vehicles is for the passengers in the other vehicle to look over at him, make eye contact with him, and look around to see where the light is coming from.

stop. As the vehicles exited the Southwest Freeway for Beltway 8, Officer Shockey pulled up side-by-side with the SUV for a second look in the vehicle with his alley light. The passengers had the same reaction as the first time Officer Shockey shone his light into their vehicle, but on this occasion, the driver swerved into Shockey's lane "a little bit," and the vehicles almost collided. Officer Shockey acknowledged that it was possible that the men in the SUV were not the home invasion suspects, but he testified that he continued following the SUV because "[t]hey weren't acting right," and he wanted to find out "why they were so nervous."

Eventually both the SUV and Officer Shockey exited the freeway. As he was following the SUV, Officer Shockey spoke with both his sergeant, informing him that he had left Sugar Land and entered Houston, and with dispatch, who attempted to contact the Harris County Sheriff's Office and the Houston Police Department ("HPD") "to see if they could come help [Shockey] out." Officer Shockey followed the SUV through a residential area, which involved many turns and led back to the frontage road of the Southwest Freeway. As the SUV approached the freeway, the vehicle sped up and rapidly changed lanes. Officer Shockey testified that the driver of the SUV did not appear to have a particular destination.

As the SUV approached a red light at an intersection, a marked HPD vehicle was ahead of the vehicles and was also approaching the intersection and traveling in the same direction. The HPD unit turned on its emergency lights to pass through the

6

intersection, and once it did pass through, the driver of that unit turned the emergency lights off and continued driving. The driver of the SUV, which had been in the left lane of the road, rapidly changed lanes to the right lane, came up behind a car in that lane as the driver approached the intersection, swerved into the middle lane, ran the red light, and turned right onto another street from the middle lane.

As Officer Shockey continued to follow, the driver of the SUV sped up and turned into another residential area. Officer Shockey then witnessed the SUV run a stop sign, and, in response, he turned on his emergency lights. Officer Shockey testified that he decided to become actively involved at this point, instead of just following the SUV, because

> [t]he recklessness and the negligence of their driving got to a point that [he] felt that [he] could no longer follow away from the jurisdiction. [He] either needed to stop them or if they continued to run be able to[,] by lights and sirens[,] broadcast a warning that was coming because they have no regard for traffic control devices, they have no regard for [the] common public.

Almost immediately after Officer Shockey turned on his emergency lights, the road that both vehicles were on came to a dead-end at a T-intersection, and, at that intersection, the driver of the SUV stopped, and the driver and three passengers all got out of the SUV and ran in different directions. Officer Shockey chased appellant, who had been sitting in the rear driver's side passenger seat, on foot for approximately 200 yards before appellant stopped in a driveway and put his hands up. Officer Shockey placed appellant under arrest at that point. Officer Shockey

7

drove appellant to Clements High School, located near the Qureshi's house in Sugar Land, for a show-up identification. He did not take appellant to Harris County or HPD authorities.

Later that evening, SLPD Sergeant M. Levan drove Afshan to Clements High School. Neither Amar nor any of her other family members were with her in this vehicle. Afshan saw "exactly the same guy who was in [her] room, [her] bedroom," wearing the same clothing that he had worn during the robbery and handcuffed to a fence while a police officer stood nearby. The lighting in the school parking lot where the show-up identification occurred was good. Afshan stayed in the patrol car, but Sergeant Levan "stopped the car really close" to appellant so she had a "pretty clear" view of him. She positively identified appellant as one of the robbers, specifically the one who stayed in the master bedroom during the robbery.

Sergeant Levan testified that on the way over to Clements High School he informed Afshan that the officers wanted her to view someone who "may or may not be involved in the crime," and he requested that Afshan tell him if the person that she viewed was involved. Levan stated because it was late at night it was dark outside, but the area where appellant was standing was lit by "standard parking lot lighting," which was supplemented by Officer Shockey's flashlight or the spotlight on his patrol car. Appellant was handcuffed, and Afshan viewed him from about ten to fifteen feet away. Afshan positively identified appellant as being involved in the

8

robbery, and she "described clothing that he was wearing that keyed her memory to when he was inside the house." Afshan made an "immediate identification" within two to three seconds after seeing appellant in the parking lot, and Sergeant Levan agreed with the State's characterization of her identification as unequivocal. Sergeant Levan testified that the show-up identification occurred "roughly two hours" after the robbery.

Former SLPD Detective B. Freeman drove Amar to Clements High School in a separate vehicle and at a separate time from Afshan. Amar did not get out of the patrol car. Detective Freeman drove up to appellant, shone his spotlight on appellant, and asked Amar if he recognized appellant, and Amar positively identified him as being involved in the robbery. Specifically, Amar identified appellant as the man who had remained in the master bedroom guarding the family. Amar testified that the man was wearing the same clothes as he had in the house. He also testified that he made a positive identification "right away."

Detective Freeman testified that Amar immediately identified appellant as being involved in the robbery and that he specifically mentioned appellant's shirt and some of appellant's facial features as being things that he distinctly remembered. He testified that spotlights from patrol cars illuminated where appellant was standing in the parking lot, in addition to the regular parking lot lights. Appellant was handcuffed, and he was the only suspect present for Amar to identify. Detective

9

Freeman stated that, in the initial post-robbery interview at the Qureshis' house, Amar described the suspects as "black males that appeared to be speaking Spanish," although one or two of the men spoke some English when telling the family what to do. Amar did not specifically describe appellant's shirt until the show-up identification.

Appellant filed two pre-trial motions to suppress. In one motion, appellant moved to suppress the traffic stop, arguing that Officer Shockey was outside of his jurisdiction at the time of the stop and that he did not have reasonable suspicion to believe appellant had committed a breach of the peace, which would have justified the stop. In his second motion, appellant moved to suppress the show-up identifications by the Qureshis, arguing that the show-up procedure used was improper and suggestive and led to a substantial likelihood of misidentification. The trial court denied both motions to suppress.

The trial court entered written findings of fact and conclusions of law. With respect to appellant's motion to suppress the stop, the trial court made the following relevant findings and conclusions:

11. Officer Shockey followed the suspect vehicle into Harris County. He noticed [an] unusual driving pattern from the vehicle while following the vehicle for approximately 15 minutes.

12. Officer Shockey observed the suspect vehicle accelerate suddenly, run a red light, turn in front of another vehicle that had the right of way, speed and run stop signs in a residential neighborhood at a dangerously high rate of speed. Said traffic

10

violations were captured on Officer Shockey's in car video system and reviewed by the trial court.

13. Officer Shockey conducted a traffic stop on the suspect vehicle after observing the above listed traffic violations by turning on his overhead emergency lights.

. . . .

2. Officer Shockey had reasonable suspicion for the offense of reckless driving at the time he initiated the traffic stop of the suspect vehicle.

3. The traffic violations of the suspect vehicle, including reckless driving, amounted to a breach of the peace under the laws of the State of Texas.

The jury ultimately convicted appellant of aggravated robbery and assessed his punishment at fifty-five years' confinement. This appeal followed.

## Motion to Suppress

In his first issue, appellant contends that the trial court erred in denying his motion to suppress the traffic stop because Officer Shockey was outside his jurisdictional boundaries and the case did not fall within one of the statutory exceptions justifying a stop. Specifically, appellant contends that the SUV-driver's conduct did not amount to a breach of the peace, which would have allowed Officer Shockey to conduct a traffic stop outside of his jurisdiction. In his second issue, he contends that the trial court erred in denying his motion to suppress the pre-trial show-up identifications of appellant by Afshan and Amar Qureshi because the

11

procedure used by the police was impermissibly suggestive and led to a substantial likelihood of misidentification.

## A. Standard of Review

We review a denial of a motion to suppress evidence for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). When we review a trial court's denial of a motion to suppress, we give "almost total deference to a trial court's express or implied determination of historical facts [while] review[ing] de novo the court's application of the law of search and seizure to those facts." *Id.* We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (quoting *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). The trial court is the "sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony." *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). The trial court may choose to believe or disbelieve any part or all of a witness's testimony. *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996). We will sustain the trial court's ruling only if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

## B. Motion to Suppress the Traffic Stop

12

Generally, "a peace officer is a peace officer only while in his jurisdiction and when the officer leaves that jurisdiction, he cannot perform the functions of his office." *Martinez v. State*, 261 S.W.3d 773, 775 (Tex. App.—Amarillo 2008, pet. ref'd). Code of Criminal Procedure article 14.03 provides statutory exceptions to this general rule, including the following provision:

> A peace officer who is outside his jurisdiction may arrest, without a warrant, a person who commits an offense within the officer's presence or view, if the offense is a felony, a violation of Chapter 42 [concerning disorderly conduct and related offenses] or 49 [concerning intoxication and alcoholic beverage offenses], Penal Code, or a breach of the peace. A peace officer making an arrest under this subsection shall, as soon as practicable after making the arrest, notify a law enforcement agency having jurisdiction where the arrest was made. The law enforcement agency shall then take custody of the person committing the offense and take the person before a magistrate in compliance with Article 14.06 of this code.

TEX. CODE CRIM. PROC. ANN. art. 14.03(d) (West Supp. 2015); *Taylor v. State*, 152 S.W.3d 749, 751 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("A Texas peace officer has authority to arrest an individual anywhere in the state, regardless of jurisdictional boundaries, for a breach of the peace that occurs in his presence."); *see also Martinez*, 261 S.W.3d at 776 (noting that provisions of article 14.03 apply to both arrests and *Terry* stops made outside officer's jurisdiction).

"Texas courts have consistently held that erratic driving can rise to the level of a breach of the peace." *Taylor*, 152 S.W.3d at 752. Whether conduct constitutes a breach of the peace "is to be determined on a case-by-case basis, looking to the

13

facts and circumstances surrounding the act." *Kunkel v. State*, 46 S.W.3d 328, 331 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). There are different degrees of erratic driving, and "the lower range of [erratic driving] would not constitute a breach of the peace in most circumstances." *Id.*

Here, while driving on the Southwest Freeway, Officer Shockey shone his alley light into an SUV that contained four men fitting the general description of the robbery suspects provided in the dispatch. The men in the SUV all remained "very rigid" and stared straightforward, refusing to acknowledge Officer Shockey or the bright light he shone into the vehicle. The driver of the SUV "slowed way down" below the posted speed limit, and Officer Shockey had to brake to avoid pulling ahead of the SUV. Officer Shockey pulled level with the SUV as both vehicles exited the Southwest Freeway for Beltway 8, and when he shone his alley light into the SUV a second time, the driver swerved into Shockey's lane and nearly caused a collision. After exiting the Beltway, the SUV drove through several residential areas, often doubling back and apparently driving with no specific destination in mind. At one point, when approaching the Southwest Freeway again, the SUV sped up and rapidly changed lanes. Later, while traveling towards a red light at an intersection, a marked HPD unit—located approximately 200 yards in front of the SUV and Officer Shockey—turned on its emergency lights to drive through the intersection. Once the HPD patrol unit passed through the intersection, the SUV,

14

which had been behind a car stopped at the red light in the right lane, swerved into the middle lane without using a turn signal, ran the red light, and turned right at the intersection from the middle lane. The driver of the SUV continued to speed up as he turned into another residential area, and, when the driver drove through a stop sign, Officer Shockey turned on his emergency lights and attempted to conduct a traffic stop. The driver of the SUV stopped at a nearby T-intersection, and all passengers in the vehicle fled.

Appellant argues that "the only issue" regarding his first appellate issue "is whether two traffic violations, running a red light and running a stop sign[,] amount to a breach of peace." To support his argument that the driver of the SUV's conduct did not amount to a breach of the peace, he cites three cases in which the "driving facts . . . far exceed the driving facts" in this case. *See Romo v. State*, 577 S.W.2d 251, 252–53 (Tex. Crim. App. 1979) (holding that driver committed breach of peace when driver drover "erratically," including speeding, weaving across center lane and onto shoulder of road, and passing arresting officer in manner that forced officer's car onto curb to avoid accident); *Taylor*, 152 S.W.3d at 751–52 (upholding trial court's finding of breach of peace when driver swerved into officer's lane on freeway, forcing another vehicle to brake and swerve to avoid collision, drove at speeds varying from 50 miles per hour to 120 miles per hour, swerved within his own lane, made "unpredictable lane changes without signaling," and abruptly exited

15

freeway in unsafe manner); *Kunkel*, 46 S.W.3d at 331 (upholding breach-of-peace finding when driver drove left wheels of her car onto center median at intersection with approximately ten other cars present, repeatedly bumped center median and outside curb with tires, crossed line dividing two lanes about 20 times within quarter-mile stretch of road, and slowed to about two miles per hour before turning). Specifically, appellant argues that this case does not rise to the level of *Romo*, *Taylor*, or *Kunkel* because Officer Shockey never testified that the driver of the SUV was driving erratically or speeding.

Although Officer Shockey never specifically testified that the driver of the SUV was "driving erratically" or that the driver's speed exceeded the posted speed limits, Shockey also testified to more than just "running a red light" and "running a stop sign." Officer Shockey testified that the driver's unsafe driving began on the Southwest Freeway, when he slowed "way below" the posted speed limit, forcing Shockey to brake to avoid pulling ahead of the SUV, and continued when the driver exited the Southwest Freeway for Beltway 8 and swerved into Shockey's lane, nearly causing a collision. Throughout the ensuing pursuit, the driver would speed up and rapidly change lanes without using a turn signal. The driver also did not merely "run a red light," but instead swerved from behind a car in the right lane into the middle lane and turned right at the intersection from the middle lane, thus running the red light and turning in front of another vehicle. The driver then continued

16

speeding up and drove through a stop sign in another residential area. Officer Shockey testified that he believed he needed to intervene at this point because the driver had "no regard for traffic control devices" and "no regard for [the] common public."

After reviewing the record from the suppression hearing in the light most favorable to the trial court's ruling, as we must, we conclude that the record supports the trial court's conclusion that the driver's conduct amounted to a breach of the peace, justifying Officer Shockey's traffic stop of the driver despite being outside of his jurisdiction. *See* TEX. CODE CRIM. PROC. ANN. art. 14.03(d); *Romo*, 577 S.W.2d at 252–53; *Taylor*, 152 S.W.3d at 751–52; *Kunkel*, 46 S.W.3d at 331. We hold that the trial court did not err in denying appellant's motion to suppress the traffic stop.[3]

We overrule appellant's first issue.

### C. Motion to Suppress the Show-Up Identifications

---

[3] In his appellate brief, appellant states, "This Court should note that the only issue regarding Appellant's first point of error is whether two traffic violations, running a red light and running a stop sign[,] amount to a breach of peace[.]" Appellant also mentions that, upon arresting him, Officer Shockey failed to notify Harris County law enforcement authorities as required by Article 14.03. To the extent that appellant argues that this failure warrants exclusion of any evidence obtained as a result of the traffic stop, we note that courts have held that "[t]he notice requirement in section 14.03(d) is administrative in nature and is unrelated to the purpose of the exclusionary rule," and, thus, failure to comply with the notice provision does not justify exclusion of evidence under Texas's statutory exclusionary rule. *Bachick v. State*, 30 S.W.3d 549, 552–53 (Tex. App.—Fort Worth 2000, pet. ref'd) (noting that "[w]here there is nothing in the record to indicate that the objectionable evidence was obtained as a result of the alleged statutory violation, exclusion is not required").

17

A pre-trial identification procedure may be so suggestive and conducive to a mistaken identification that subsequent use of this identification at trial would deny the accused due process. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995); *Mendoza v. State*, 443 S.W.3d 360, 363 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We review de novo the question of whether a particular pre-trial identification procedure amounted to a denial of due process. *Mendoza*, 443 S.W.3d at 363; *see Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009) (applying standard in context of reviewing ruling "on how the suggestiveness of a pre-trial photo array may have influenced an in-court identification"). In making this determination, we use a two-step process: (1) first we determine if the pre-trial identification procedure was impermissibly suggestive; and (2) if we conclude that it was, we then determine if the impermissibly suggestive nature of the pre-trial identification gave rise to a substantial likelihood of irreparable misidentification. *Mendoza*, 443 S.W.3d at 363; *Burkett v. State*, 127 S.W.3d 83, 86 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The defendant bears the burden of establishing, by clear and convincing evidence, that the pretrial identification procedure was impermissibly suggestive. *Burkett*, 127 S.W.3d at 86 (citing *Barley*, 906 S.W.2d at 33–34).

We consider the totality of the circumstances when determining whether the pre-trial identification procedure was so impermissibly suggestive as to give rise to

a substantial likelihood of misidentification. *Gamboa*, 296 S.W.3d at 581–82 (quoting *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998)). The non-exclusive factors that we consider include: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of confrontation; and (5) the length of time between the offense and the confrontation. *Id.* at 582 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972)). "We consider these issues of historical fact in the light most favorable to the trial court's ruling, then weigh them de novo against the 'corrupting effect' of the suggestive pretrial identification procedure." *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Burkett*, 127 S.W.3d at 87. If the totality of the circumstances indicates that a substantial likelihood of irreparable misidentification exists, admission of the identification amounts to a denial of due process. *Adams*, 397 S.W.3d at 764. "On the other hand, if the pretrial procedure is found to be impermissibly suggestive, identification testimony would nevertheless be admissible where the totality of the circumstances shows no substantial likelihood of misidentification." *Id.* (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999)).

Although courts have acknowledged that "on-the-scene" or "show-up" identifications have "some degree of suggestiveness," they have also held that use

19

of such identifications may be necessary "in cases where time is of the essence in catching a suspect and an early identification is aided by the fresh memory of the victim." *Mendoza*, 443 S.W.3d at 363; *see Santiago v. State*, 425 S.W.3d 437, 442 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("The initial show-up procedure at the crime scene was not shown to be impermissibly suggestive, as such confrontations have been acknowledged as being necessary in many cases."). The Court of Criminal Appeals has acknowledged the benefits of such a procedure:

> First of all by viewing the alleged perpetrator of the offense immediately after the commission of the offense, the witness is allowed to test his recollection while his memory is still fresh and accurate. Additionally the quick confirmation or denial of identification expedites the release of innocent suspects. Thus the innocent suspect need not be transported to jail and detained until a lineup can be constructed. Furthermore the police would be able to release the innocent suspect and continue their search for the criminal while he is still within the area and before the criminal can substantially alter his looks and dispose of evidence of the crime. Finally, any possible prejudice resulting from such a confrontation can be exposed by rigorous cross-examination of the witness.

*Garza v. State*, 633 S.W.2d 508, 512 (Tex. Crim. App. 1981) (internal citations omitted); *Mendoza*, 443 S.W.3d at 363–64; *Santiago*, 425 S.W.3d at 442.

Here, after arresting appellant, Officer Shockey transported him to Clements High School, located close to the Qureshis' house, for a show-up identification approximately two or three hours after the robbery occurred. SLPD officers drove Afshan and Amar Qureshi to the high school in separate vehicles. *See Mendoza*, 443 S.W.3d at 364 ("The police employed safeguards to reduce any influence the

complainants could have had on each other in the identification process by keeping them separate en route to and during the show-up, which prevented them from comparing or discussing the suspects' features during that timeframe."). Both Afshan and Amar testified that they noticed that appellant was handcuffed to a fence. Sergeant Levan, who drove Afshan to the high school, testified that he told her that she was going to view an individual who "may or may not be involved in the crime," and he asked her to inform him if appellant had been involved. Detective Freeman, who drove Amar to the high school, told Amar that the person he was going to see might have been involved in the robbery, and he asked Amar if he recognized appellant. During the procedure, the area was well lit by both the lights in the parking lot and the spotlights from two patrol cars.

Although appellant was visibly handcuffed at the time of the show-up identifications, the show-up identifications occurred relatively soon after the robbery, while the event was still fresh in Afshan's and Amar's minds, the Qureshis were kept separate before and during the show-up identifications, and the officers informed the Qureshis that appellant "may or may not be involved" in the robbery when they asked the Qureshis if they recognized appellant. Furthermore, appellant's counsel had the opportunity to cross-examine Afshan, Amar, Sergeant Levan, and Detective Freeman at the suppression hearing and at trial, which "gave defense counsel an opportunity to expose any possible prejudice resulting from the pretrial

21

identification procedure." *Id.* We conclude that appellant has not demonstrated by clear and convincing evidence that the show-up procedure used in this case was impermissibly suggestive. *See Burkett*, 127 S.W.3d at 86 (citing *Barley*, 906 S.W.2d at 33–34); *see also Santiago*, 425 S.W.3d at 442 ("Santiago has not shown by clear and convincing evidence that there was any abuse of the [show-up] procedure.").

However, even if the show-up identification procedure in this case was impermissibly suggestive, to obtain reversal of the trial court's ruling denying his motion to suppress the identifications, appellant must also demonstrate that the procedure "gave rise to a substantial likelihood of irreparable misidentification." *Mendoza*, 443 S.W.3d at 363; *Burkett*, 127 S.W.3d at 86–87. "Reliability is the 'linchpin' in determining admissibility of such identification testimony. If sufficient indicia of reliability outweigh suggestiveness, then an identification is admissible." *Burkett*, 127 S.W.3d at 88 (internal citations omitted).

The first two factors that we consider are the witness's opportunity to view the defendant at the time of the crime and the witness's degree of attention. Both of the Qureshis, Afshan in particular, had great opportunity to view appellant at the time of the offense and paid a high degree of attention to appellant. Both Afshan and Amar identified appellant as the man who stood in the master bedroom and guarded them while his fellow robbers ransacked the rest of the house. Although appellant wore a cap pulled down over part of his face, his face was still visible, and

the lights were on in the bedroom.[4] He stood about six or seven steps from Afshan throughout the encounter, which lasted thirty-five to forty minutes. Appellant was thus the only perpetrator with the Qureshis for an extended period of time. Furthermore, Afshan testified that she spoke with appellant on several occasions throughout the incident. Although Amar was slightly further away and mostly had his head down throughout the robbery, he testified that he could see appellant out of the corner of his eye. Both Afshan and Amar had a "clear view" of appellant and were able to get a "good look" at him during the offense. *See id.* (holding that complainant had "adequate opportunity" to view perpetrator at time of offense when car was parked right next to defendant's car, late-morning light was good, and complainant looked at defendant for about fifteen to twenty seconds). Moreover, the Qureshis were the complainants in this case and thus were "more than just casual observers of the crime." *See Barley*, 906 S.W.2d at 35. They both had "more reason to be attentive" to their surroundings and the perpetrators of the robbery. *See id.*

The third factor that we consider is the accuracy of the witness's prior description of the criminal. Neither Afshan nor Amar gave specific descriptions of any of the robbers in their written statements to police made at their house and before

---

[4]  Detective Freeman testified that, upon viewing appellant during the show-up identification, Amar stated, "That's the guy. That's one of the guys that [was] there. I remember his shirt distinctively. He had something covering his face, but that's the guy that was there."

the show-up identifications. Instead, both of them generally described the robbers as black or Hispanic males who spoke Spanish and who wore dark clothing. Although appellant does fit within the general description that the Qureshis provided to the police, due to the lack of specificity in their initial descriptions, this factor weighs in favor of appellant.[5] *See Cantu v. State*, 738 S.W.2d 249, 253–54 (Tex. Crim. App. 1987) (noting that witness's prior "very general" description of criminal, while technically accurate, weighed in favor of defendant, but holding that remainder of factors weighed in favor of holding that pre-trial identification procedure did not create substantial likelihood of mistaken identification); *cf. Barley*, 906 S.W.2d at 35 (noting that witnesses each provided "fairly detailed" descriptions of perpetrator, including clothing and hairstyle, and that defendant fit "within the detailed descriptions provided at the scene by each" witness).

The fourth factor we consider in determining whether the pre-trial identification procedure gave rise to a substantial likelihood of irreparable misidentification is the level of certainty of the witness at the time of the confrontation. Here, both Afshan and Amar displayed a high level of certainty that appellant was one of the robbers. Sergeant Levan testified that Afshan made an

---

[5] We note that, at the time of the show-up identification, both Afshan and Amar positively identified appellant as the person who was guarding them in the master bedroom, and each of them indicated to police officers that they recognized appellant, in part, due to his clothing, which was the same as at the time of the robbery.

24

"immediate identification" within two or three seconds of seeing appellant at the high school, and he agreed with the State that Afshan's identification was "unequivocal." Amar also made a positive identification "right away," and Detective Freeman agreed, stating that Amar "immediately" said, "That's the guy." *See Burkett*, 127 S.W.3d at 89 (considering fact that witness identified defendant as perpetrator "immediately and without hesitation"). Both Afshan and Amar identified appellant as not just one of the men involved with the robbery, but the man who guarded them in the master bedroom, and both of them identified him at trial as this individual. *See id.*

Finally, the show-up identifications here took place approximately two or three hours after the robbery. Afshan and Amar thus had the opportunity to view appellant while the offense was still fresh in their memories, reducing the likelihood of misidentification. *See Mendoza*, 443 S.W.3d at 364 ("The pretrial identification occurred approximately one hour after the robbery, which allowed the complainants to view the suspects while the events surrounding the robbery were still fresh in the complainants' minds."); *Adams*, 397 S.W.3d at 764 (holding that "no substantial likelihood of misidentification occurred" in case where complainant viewed video lineup eleven days after robbery).

We conclude that, even if the pre-trial show-up identification procedure used in this case was impermissibly suggestive, the totality of the circumstances

demonstrates that this procedure did not give rise to a "substantial likelihood of irreparable misidentification." *See Gamboa*, 296 S.W.3d at 581–82; *Mendoza*, 443 S.W.3d at 363; *Burkett*, 127 S.W.3d at 86–87. We therefore hold that the trial court did not err in denying appellant's motion to suppress the pre-trial show-up identifications.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Brown, and Huddle.

Publish. TEX. R. APP. P. 47.2(b).