

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-17-00139-CR

Demond **FRANKLIN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR6149A
Honorable Melisa Skinner, Judge Presiding

Opinion by:     Irene Rios, Justice

Sitting:     Marialyn Barnard, Justice
         Patricia O. Alvarez, Justice
         Irene Rios, Justice

Delivered and Filed:  June 27, 2018

AFFIRMED

Demond Franklin appeals his conviction for the offense of capital murder and sentence of life imprisonment without parole.  Franklin raises four issues on appeal, arguing the trial court erred by: admitting a pre-trial photo identification and cellular mapping analysis evidence; imposing the sentence of life without parole absent evidence Franklin was eighteen years' old at the time of the offense; and refusing to grant Franklin's motion for new trial.  We affirm the judgment of the trial court.

## BACKGROUND[1]

In a two-count indictment, the State charged Franklin with the offenses of capital murder and felony murder for the shooting death of Deandre Thompson, which occurred during a home invasion-robbery in the early-morning hours of October 22, 2014. The State presented the jury with testimony from nineteen witnesses, and Franklin presented testimony from two witnesses. The jury found Franklin guilty of capital murder. Because the State did not pursue the death penalty, the trial court assessed punishment at life imprisonment without parole. This appeal followed.

## ANALYSIS

### Pretrial Photo Identification

In his first issue, Franklin contends the trial court erred by admitting evidence of a pretrial photo identification in which witness Angel Mendez identified Franklin. Franklin filed a motion to suppress the identification prior to trial, alleging the photo identification was impermissibly suggestive. The trial court denied the motion to dismiss. On appeal, Franklin specifically argues the photo identification was improper because two "fillers" in the photo array exhibited receding hairlines, which Franklin does not have, and Franklin was the only individual in the photo array with a widow's peak.

### *Standard of Review and Applicable Law*

A pretrial "identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). In determining whether a particular pretrial identification procedure amounted to a denial of due process, we determine (1)

---

[1] Because Franklin does not challenge the sufficiency of the evidence supporting the jury's guilty verdict, we forgo a recitation of the facts surrounding the underlying offense.

whether the procedure was impermissibly suggestive, and if so, (2) whether the suggestiveness gave rise to a substantial likelihood of irreparable misidentification. *Nunez-Marquez v. State*, 501 S.W.3d 226, 235 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd.).

"A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive." *Burkett v. State*, 127 S.W.3d 83, 86 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd.). Suggestiveness may result from the manner in which the procedure is conducted, such as when the police point out the suspect or suggest that a suspect is included in the lineup. *Barley*, 906 S.W.2d at 33.

"[W]hether a pretrial identification procedure was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor; therefore, we apply a de novo standard of review." *Gilmore v. State*, 397 S.W.3d 226, 234 (Tex. App.—Fort Worth 2012, pet. ref'd.) (citing *Gamboa v. State*, 296 S.W.3d 574, 581–82 (Tex. Crim. App. 2009)). In determining whether the photo identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, we consider the totality of the circumstances. *Gamboa*, 296 S.W.3d at 581-82. The non-exclusive factors to be considered include the witness's opportunity to view the offender at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the offender, the witness's level of certainty, and the length of time between the offense and the confrontation. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing *Neil v. Biggers*, 409 U. S. 188, 199 (1972)).

### *Discussion*

During a hearing on Franklin's motion to suppress, San Antonio Police Department Detective Mark Duke testified he administered the photo identification as a blind administration, meaning he did not know which of the people included in the photo array was the suspect.

Detective Duke testified the photo array included eight folders, six of which contained photos and two that were empty. Detective Duke explained that during the identification procedure, the witness opened the folders individually to view the contents. The witness then either signed the photograph he identified as the suspect or "fill[ed] out the identification page." In this case, Mendez indicated the photo number from the photo array by marking the identification page. The identification page submitted into evidence indicates Mendez identified photo number three, which was the photo of Franklin.

Franklin's expert, Dr. Roy Malpass, testified as an eyewitness identification expert during the hearing. Dr. Malpass expressed concerns about the identification procedures used in this case. Dr. Malpass testified the photo array was suggestive because, unlike the other individuals in the array, Franklin had a widow's peak, which Dr. Malpass described as "a little dip in the hairline, etcetera." Dr. Malpass further noted the level of the hairlines in the other photos varied from "lower" to "medium" to "very, very high." Additionally, Dr. Malpass pointed out that in one photo, "the mass of the hair … is quite larger" and the hairline in another of the photos was "kind of a scooped shape." The trial court denied Franklin's motion.

Before the jury, Mendez described seeing two men outside his apartment between 1:30 a.m. and 1:45 a.m. on October 22, 2014. Mendez testified he viewed the two men from as close as one to two feet away as he walked his dog. Mendez returned to his apartment at approximately 1:45 a.m. Mendez testified he found the men suspicious and therefore watched the two men for another fifteen to twenty minutes until the men walked out of his view. Mendez explained that he contacted authorities the next day to report the suspicious men after he learned that a murder occurred at his apartment complex.

Mendez took part in a photo identification on November 3, 2014. Mendez testified he identified photo number three with eighty percent assurance that photo number three was one of

the men he viewed outside his apartment on the date of the murder. Dr. Malpass also testified before the jury and expressed his concerns regarding the identification procedure. Dr. Malpass explained, as described above, his reasons for believing the pretrial identification procedure was unreliable.

In this case, all the photos included in the photo array are "head shots" depicting African-American men who appear to be similarly aged. The photos do not indicate the men's height or weight. Mendez testified the photo array consisted of black and white photocopied photographs. The clothing worn by the men in the photos is evenly split between light-toned and dark-toned, as well as between collared and non-collared shirts. The faces of all six men are clearly visible, and they all appear to have a slight amount of facial hair. All six men have their hair cut in the same general style, although three men have their hair cut shorter than the others. *See Luna*, 268 at 607-08 (noting that photographs included in a photo array "need not be identical to satisfy due process requirements").

Thus, notwithstanding Dr. Malpass's testimony regarding problems with the composition of the photo array, Franklin has not established that the procedure leading to Mendez's identification of him as one of the men outside Mendez's apartment near the time of the murder was unnecessarily or impermissibly suggestive. Accordingly, we conclude the trial court did not err by admitting evidence of Mendez's pretrial identification.

Issue one is overruled.

### Cellular Mapping Analysis

In his second issue, Franklin contends the trial court erred by allowing FBI Special Agent Mark Sedwick to testify regarding cellular mapping analysis. Specifically, Franklin argues the location data upon which Agent Sedwick relied was undated, unauthenticated, and not sufficiently reliable to be relevant.

### *Standard of Review*

We review a trial court's decision to admit evidence for an abuse of discretion. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); *Estrada v. State*, 352 S.W.3d 762, 768 (Tex. App.—San Antonio 2011, pet. ref'd). A trial court does not abuse its discretion if its decision lies within the zone of reasonable disagreement. *Walters*, 247 S.W.3d at 21.

An objection must be specific, timely, and made each time inadmissible testimony or evidence is offered. *Haley v. State*, 173 S.W.3d 510, 516-17 (Tex. Crim. App. 2005). However, a party is not required to continue making objections if he either obtains a running objection or requests a hearing outside the presence of the jury. *Id*. at 517; *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Evidentiary error is not preserved when the same evidence is admitted elsewhere without objection. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

### *Discussion*

During a pretrial hearing, Agent Sedwick explained that he is a member of the FBI's cellular analysis survey team, "a group of specially trained agents and task force officers who have been trained as experts in the analysis of historical call detail records or CDRs." Agent Sedwick testified call detail records provide "the person who made the call, person who received the call, and then the date and time, the length of the call, and also the cell tower and sector that was utilized during that phone call." Agent Sedwick also testified that he could plot the cell towers on a map and the approximate locations from where mobile phone calls were made or received in relation to the cell tower that was utilized and in relation to other towers in the area. The trial court determined Agent Sedwick could testify as an expert witness in the area of historical cellular mapping and analysis.

Before the jury, Agent Sedwick referenced four maps he created using data provided by the cellular phone carriers. State's Exhibit No. 75 shows the location of cellular towers in the Bexar County area as well as four addresses of interest. Agent Sedwick testified he used the map of towers depicted in Exhibit No. 75 to create State's Exhibit No. 76, which shows the cellular tower usage by the cellular phones associated with Franklin and two witnesses between 10:06 p.m. and 11:55 p.m. on October 21, 2014, as well as the addresses of interest.

Franklin objected to the admission of State's Exhibit No. 76, specifically stating:

We're going to object to the hearsay and then we're also — I need a clarification from the Court because he previously just said that these maps have to do with September of 2014. So if it's September 2014 maps, then we're going to object to the relevance.

Agent Sedwick clarified the data he used in creating the maps was provided by cellular phone carriers. The trial court noted that the phone numbers associated with Franklin and the two witnesses were part of the previously admitted records that were provided to Agent Sedwick in order to generate the mapping analysis. According to Agent Sedwick, the map of towers was specifically created from "the most recent tower list published by the phone companies" in relation to the date of the offense and that the tower list indicated "the towers that were in existence at the time of the crime." The trial court overruled Franklin's objections and admitted Exhibit No. 76.

Shortly thereafter, the State offered State's Exhibits No. 77 and No. 78, which show the cellular usage by the same three phones between 12:15 a.m. and 3:10 a.m. and between 3:22 a.m. and 6:58 a.m. on October 22, 2014, respectively. Exhibits No. 77 and No. 78 also depict the same cellular tower locations and addresses of interest included in Exhibit No. 76. Franklin did not object to the admission of Exhibits No. 77 and No. 78. By failing to object to Exhibits No. 77 and No. 78, which contain the same information as Exhibit No. 76, Franklin waived review of this issue. *Id*.

Franklin's second issue is overruled.

**Improper Sentence**

In his third issue, Franklin contends the trial court erred by imposing the sentence of life without the possibility of parole without evidence of Franklin's age at the time of the offense. Franklin argues the trial court's "sentence was illegal because the State presented no evidence establishing [Franklin] was at least eighteen (18) years old on the date of the offense" during either the guilt/innocence phase or sentencing. Franklin further argues the "default position" regarding punishment in this case, without proof of his age, should have been to presume he was not yet eighteen years of age on the date of the offense. In response, the State points out that this court previously concluded in *Garza v. State*, that a defendant's age for purposes of avoiding a sentence of life imprisonment without parole is an affirmative defense for which a defendant bears the burden, not an element of the offense for which the State bears the burden. *See Garza v. State*, 453 S.W.3d 548, 555 (Tex. App.—San Antonio 2014, pet. ref'd).

*Applicable Law*

The Texas Code of Criminal Procedure states:

> If a defendant is found guilty in a capital felony case in which the state does not seek the death penalty, the judge shall sentence the defendant to life imprisonment or to life imprisonment without parole as required by Section 12.31, Penal Code.

TEX. CODE CRIM. PROC. ANN. art. 37.071 (West Supp. 2017). Penal Code section 12.31(a) requires that:

> An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for … life, if the individual committed the offense when younger than 18 years of age; or … life without parole, if the individual committed the offense when 18 years of age or older.

TEX. PENAL CODE ANN. § 12.31(a)1, 2 (West Supp. 2017).

In *Garza v. State*, we equated the proof of age at the time a capital offense occurred to proof of mental retardation in capital cases. *Garza*, 453 S.W.3d at 553-54. We noted that the Texas Court of Criminal Appeals "held the burden was upon the defendant to establish [mental retardation] by a preponderance of the evidence." *Id.* at 554 (citing *Ex parte Briseno*, 135 S.W.3d 1, 2 (Tex. Crim. App. 2004)). We further pointed out the Court of Criminal Appeals "explained that a lack of mental retardation is not an implied element of the crime of capital murder that the State must prove. … [T]he absence of mental retardation does not increase the penalty of the crime beyond the statutory maximum, and thus, is not an element of the offense." *Id.* (internal citations omitted). We additionally recognized the Court of Criminal Appeals' decision in *Hall v. State*, in which the court held that mental retardation is "comparable to an affirmative defense," for which the defendant bears the burden to prove by a preponderance of the evidence. *Id.* (quoting *Hall v. State*, 160 S.W.3d 24, 38 (Tex. Crim. App. 2004)).

Guided by the reasoning in *Briseno* and *Hall*, we held "that like mental retardation, [a defendant's] age at the time of the offense is in the nature of an affirmative defense, and it is [the defendant's] burden to prove by a preponderance of the evidence that he was [under the age of eighteen] at the time of the offense in order to avoid the penalty of life without the possibility of parole." *Garza*, 453 S.W.3d at 554. A defendant's age at the time of the offense is in the nature of an affirmative defense, which must be proven by the defendant by a preponderance of the evidence regardless of whether the issue is presented at trial or in a habeas proceeding. *C.f. Hall*, 160 S.W.3d at 36, 37 (recognizing that the issue of mental retardation to avoid the death penalty may be presented in a habeas proceeding as well as at trial).

### *Discussion*

As a preliminary matter, we note the appellate record is completely devoid of any evidence regarding Franklin's date of birth. We further note that the State initially sought the death penalty

in the underlying case, but nothing in the record before us indicates any objection to the State pursuing the death penalty because of the defendant's age at the time of the offense. We conclude that because Franklin failed to raise the issue of whether he was eighteen years' old at the time of the offense, the issue cannot be raised now on direct appeal.

Issue three is overruled.

## Motion for New Trial

In his fourth issue, Franklin contends the trial court erred by denying his motion for new trial. The trial court held a hearing on Franklin's motion for new trial, which alleged improper outside influence on the jury. Following that hearing, the trial court denied Franklin's motion for new trial. Thereafter, the trial court granted a motion to reconsider the motion for new trial and recused herself. A second hearing was held by a different trial court. At the close of the second hearing, the second trial court denied Franklin's motion for new trial.

### *Standard of Review*

We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Id*. A trial court abuses its discretion in denying a motion for new trial "when no reasonable view of the record could support [its] ruling." *Id*. We "view the evidence in the light most favorable to the trial [court's] ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party." *Id*. At a motion for new trial hearing, "the [trial court] alone determines the credibility of the witnesses." *Id*. "Even if the testimony is not controverted or subject to cross-examination, the trial [court] has discretion to disbelieve that testimony." *Id*.

***Discussion***

Franklin raised a single matter in his motion for new trial: "during the [j]ury's deliberation, … an outside influence was improperly brought to bear on one or more jurors … in violation of Texas Rule of Evidence, R. 606(b)(2)(A)." Franklin attached an affidavit from juror P.J., who attested the following:

> After the conclusion of the trial and during deliberations in the jury room in which I was the single hold-out vote for not guilty, one of the jurors, [R.M.], disclosed that he had been to the crime scene at the apartments where the shooting took place and conducted his own investigation into issues raised at the trial. As a result of this juror's information which he imparted to me, along with pressure from other jurors, I was influenced to change my vote to guilty.

"Texas Rule of Evidence 606(b) prohibits a juror from testifying about 'any matter or statement occurring during the jury's deliberations.'" *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012) (citing TEX. R. EVID. 606(b)). The relevant exception to this rule is that a juror may testify about "whether any outside influence was improperly brought to bear upon any juror." *Id.*; *see* TEX. R. EVID. 606(b)(2)(a). An outside influence is "something originating from a source outside of the jury room and other than from the jurors themselves." *McQuarrie*, 380 S.W.3d at 154.

During the second hearing, the trial court heard the following testimony from seven jurors to determine the extent, if any, to which juror R.M.'s visit to the crime scene and the information he shared with other members of the jury influenced jury deliberations or impacted the outcome of the case.

- Juror J.B. testified he was aware another juror went to the crime scene. According to J.B., R.M. "said it was exactly like the video that we saw." J.B. testified he and the other jurors did not discuss what R.M. told them. J.B. did not think the information from R.M. made much difference, and he stated the information "absolutely [did] not" affect his deliberations.

- Juror D.D. testified she remembered R.M. saying he went to the apartment complex. D.D. stated, "I think he basically said that he went there and that was about it." D.D. affirmed the information had no impact on her verdict.

- Juror C.L. testified R.M. told the jury he went to the scene and "said it was just the same." C.L. was unconcerned and testified she was not aware of any specific discussion provoked by the information because she was playing on her phone at the time. C.L. stated the information R.M. imparted had no impact on her verdict.

- Juror D.R. testified he understood R.M. went to the crime scene and his visit confirmed what the jury had heard in court regarding the layout, lighting, and apartment location. According to D.R., R.M.'s comments were minimal and generated no discussion.

- Juror M.S. testified he recalled one of the jurors went to the crime scene, but he did not recall at what point during trial the visit occurred. M.S. stated there was no discussion regarding the information from R.M. and the information did not affect his verdict.

- Juror R.W. testified that R.M.'s report to the jury that "he could see" with regard to the lighting at the apartment complex did not impact his verdict.

- Juror P.J. testified R.M. informed the jurors the lighting at the apartment complex was "pretty much" what they had heard in the trial testimony. According to P.J., R.M. made no other observations, but the information provoked discussion and affected her verdict.

After hearing the testimony and reading the transcript of the first hearing, the second trial court denied Franklin's motion for new trial.

We conclude that a reasonable view of the record supports the trial court's determination. As noted above, all of the jurors called testified the information imparted by R.M. as a result of his visit to the crime scene did not contradict the testimony presented during trial. The information imparted by R.M. provoked little to no discussion. Further, all but one of the jurors testified the information had no impact on their verdict. Accordingly, we find the trial court did not abuse its discretion by denying Franklin's motion for new trial.

Issue four is overruled.

## CONCLUSION

Based on the foregoing reasons, we affirm the judgment of the trial court.

Irene Rios, Justice

DO NOT PUBLISH