**Opinion issued April 10, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00250-CR

————————————

**KEDARIYON DOMINQUE RAGSDALE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 361st District Court[1]**
**Brazos County, Texas**
**Trial Court Case No. 16-03766-CRF-361**

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal from the Court of Appeals for the Tenth District of Texas to this Court. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). We are unaware of any conflict between precedent of that court and that of this court on any relevant issue. *See* TEX. R. APP. P. 41.3.

**O P I N I O N**

Appellant Kedariyon Ragsdale appeals his conviction for aggravated robbery. *See* TEX. PENAL CODE §§ 29.02(a); 29.03(a)(2). In four issues, he contends that the trial court erred in denying him a speedy trial, that the evidence is insufficient to support his conviction, and that the trial court erred in admitting evidence of pretrial and in-court identifications made by witnesses. We affirm.

## Background

In August 2016, Ragsdale was indicted for aggravated robbery alleged to have been committed in May 2016 in College Station, Texas. In August 2018, Ragsdale was arrested and released on bond the same day. He proceeded to a jury trial in Brazos County in February 2023. The jury found him guilty and assessed his punishment at 10 years' imprisonment.

### A. State's Witnesses

At trial, the jury heard from Toren Webb. Webb testified that in 2016, he lived in College Station while attending Blinn College. He lived with his high school friends Ekow Amua-Sekyi and Johnathan Fulgencio. They were randomly assigned a fourth roommate named Danny Diaz. The four roommates lived in a two-story apartment with four bedrooms. Webb knew that Diaz sold marijuana out of their apartment.

2

Around 2:00 a.m. in late May 2016, Webb heard someone knocking at the door. When he opened the door, a man with tattoos asked for Diaz. Webb told the man that Diaz was not there. The man did not leave, but Webb shut the door, locked it, and tried to go back to sleep.

Moments later, Webb heard a rock go through a window. He put on clothes, grabbed a pocketknife, and went back to the front door. The living room window was broken, and a rock was on the ground. He opened the door but found no one outside. Fulgencio came out of his bedroom, and Webb told him what had happened. Fulgencio's girlfriend Mary Billi was also staying in Fulgencio's upstairs bedroom that evening. Webb described the person knocking on the door to Fulgencio. Fulgencio told Webb that the person was a man named "Cross." Webb returned to his bedroom.

Webb testified that he then heard another knock at the door. This time, he sprinted to the front door and found the same person, Cross, was there again. Webb was angry and confronted Cross, asking him why he was in front of his apartment so late and why he had thrown the rock through the window. Cross told Webb that it was not him, but that people in the parking lot had been going through cars and it could have been them. Webb went back to his bedroom to put on shoes so he could go outside. As Webb was getting dressed, Fulgencio spoke with Cross. Webb then heard Fulgencio screaming, "Stop!"

Webb saw Fulgencio try unsuccessfully to push the door closed to prevent the men from coming in. Cross and two other men came into the apartment. Webb testified that the two men behind Cross started pointing guns at Fulgencio. One of them was "short [and] skinny. He was black [with] short hair." Webb described the other gunman as larger, with short dreads. He stated that the other man was about his height and heavier set.

Webb testified that he went to his room to call 911. He closed and locked his door and put his body against the door to keep the three men from entering. Suddenly, his door fell on top of him as someone broke it down. The jury viewed photos of the damage to the door frame. Webb identified Ragsdale in court as the person who broke down his door. He testified that he would never forget Ragsdale's face.

Ragsdale also pointed a gun in Webb's face and asked him repeatedly for Diaz and "the pressure." Webb understood Ragsdale to be asking where he could find marijuana in the apartment. Webb told Ragsdale that he did not have any marijuana, and that Diaz was not there.

Webb testified that when Amua-Sekyi came out of his bedroom, the robbers pointed guns at him and yelled at him to get on the ground. Amua-Sekyi yelled back, "Don't shoot!" Webb heard Amua-Sekyi tell the robbers that he did not know where

4

any marijuana was in the apartment. Webb testified that the skinny robber with a gun then punched Amua-Sekyi in the face.

According to Webb, Cross was acting like he was also being robbed. Webb found it suspicious because Cross happened to be outside their apartment before the robbery occurred. Webb testified that the robbers forced Billi down the stairs and on to the couch. They then forced the three male roommates upstairs to Diaz's bedroom. They told them to empty all the drawers. One of the men found a safe in the closet and told the roommates to open it. The roommates could not do so. The robbers then told them to open a filing cabinet. Webb and Amua-Sekyi did so, but it only contained papers. No marijuana was found in the room.

Webb went downstairs with Amua-Sekyi, Billi, and Cross. Fulgencio remained upstairs with the other two robbers. Webb told Amua-Sekyi and Billi to go get help. Amua-Sekyi and Billi ran out of the apartment. When they did so, Cross screamed out, "They're running!" The two robbers with guns came downstairs, and Cross opened the door for them as they left with stolen items from the apartment. Webb and Fulgencio were in the apartment after the robbers left. They soon found Amua-Sekyi and Billi at a nearby apartment.

The jury viewed a photograph of Amua-Sekyi's facial injuries. Webb testified that in the days after the robbery, Amua-Sekyi's face "got knotted up pretty bad."[2] The jury also saw photos of Diaz's room and the damage to the door frame.

Webb testified that the police responded that night. Webb provided descriptions of the robbers to the police. Law enforcement later showed him three different photo arrays of potential suspects. Webb testified that he was presented with a first photo array on the day of the robbery. He identified one suspect as the person who was banging on the door asking for Diaz. A week later, he was presented with a second photo array. He identified the man shown on Photo 3 as the bigger man who knocked down his bedroom door. He was 100 percent confident in his identification. Two weeks later, authorities showed Webb a third photo array. He identified the man shown on Photo 4 as the third person involved in the robbery. He was "very positive" that the man was part of the robbery and the person who was upstairs making him open drawers.

A responding officer testified that he was dispatched to the apartment the night of the robbery. He found the apartment ransacked. Two bedroom doors had been kicked completely off their hinges, and a downstairs window was broken. The complainants told the officer that one suspect was "a lighter-skinned black male" with a large cross tattoo. The complainants suggested his name was "Cross." The

---

[2]    Amua-Sekyi was unavailable to testify at trial due to military service.

responding officer was familiar with Dwanteria Cross because they went to high school together, and the officer had arrested Cross the previous night for marijuana possession. The responding officer told the detective assigned to the case that the description of Cross matched the person he knew as Dwanteria Cross.

Dwanteria Cross testified at trial. He stated that part of his plea agreement was to provide truthful testimony concerning his codefendants. The trial court admitted Cross's indictment, plea agreement, and judgment into evidence. Cross testified that he had pleaded guilty to aggravated robbery that occurred on May 25, 2016. He was sentenced to 18 years' imprisonment. Cross did not remember testifying about the aggravated robbery during his plea hearing. He testified that he remembered going to the apartment on the day of the offense and that he blacked out. He stated he knew of some of the people living in the apartment.

After Cross was excused from the stand, the reporter's record from his plea hearing was published to the jury. That testimony included Cross's admission that on May 25, 2016, he and two other men went to an apartment to rob a drug dealer named Danny Diaz who lived there. Cross testified that his role was to go in and set up the robbery. The other men came behind him with guns and robbed the apartment's occupants. He testified that the other men went into the apartment with guns brandished. They took drugs and cash. Cross named Kendrick Patterson and Kedariyon Ragsdale as the two other men who robbed the apartment with him. He

7

identified a photograph of Ragsdale, which was the same photograph of Ragsdale used in the photo array shown to the complainants.

Mary Billi testified that in May 2016, she ended her freshman year at Texas A&M University. At the time, she was dating Fulgencio. She also knew his friends Amua-Sekyi and Webb. They all attended the same high school, but Billi did not meet them until college. She stated that Fulgencio, Amua-Sekyi, and Webb had a fourth roommate named Danny Diaz.

On the night of the robbery, Billi spent the night of the robbery at Fulgencio's apartment in his room on the second floor. She woke up to someone banging on the front door while yelling loudly for Diaz. She later heard a rock thrown through a window. She heard Fulgencio scream her name from downstairs, and she heard a commotion and stomping. Billi tried to get up and close the bedroom door and lock it so she could call 911. Instead, she was taken out of the room in a chokehold. The person who put her in a chokehold held a gun to her head, and she thought she was going to die. The man pushed her downstairs to a landing on the stairwell, and she crouched with her hands up. She saw someone sitting on the couch. That person did not have a shirt on and had a large cross tattoo on his chest. That person did not have a gun, but the other two robbers had guns. She was later moved to the couch next to the man with the cross tattoo.

Billi testified that the lights were on in the apartment, and she got a good look at all three robbers. She stated that the robber who pointed a gun at her was taller and was wearing a white shirt. The shorter robber told her to get her wallet and demanded the cash inside. She did not have any cash, so she just left the wallet in Diaz's room and went back down to the couch. Billi testified that she was so afraid someone was going to die that she covered her ears so she would not hear the gunshots. At some point, she and Amua-Sekyi were able to escape to a neighbor's apartment and call 911. A few minutes later, Webb and Fulgencio joined them.

Later that night, the police arrived. Billi testified that the police asked the group lots of questions about marijuana. Billi believed that Diaz was probably selling marijuana because she saw a lot of people coming and going from his room. Billi testified that she was shown a photo array about a week later. The officer first read her some instructions and then showed her one photo after another. She identified the man shown on Photo 3 as "the taller guy with the white shirt on." She was 50 percent certain of her identification because the "baggier clothes, short hair, the face just looked familiar." She said the man in the photo was the person who pointed a gun at her.

Detective R. Wilson of the College Station Police Department testified that he had 32 years of experience, and he worked major felonies. He stated that there is

9

often a connection between drugs and violent crime, and he thought this robbery was a "drug rip."

Detective Wilson explained his investigation. Since Diaz was not present on the night of the robbery, Detective Wilson obtained a search warrant for Diaz's room. Detective Wilson found vacuum bags and a vacuum sealer, which he believed were used to break down quantities of marijuana for selling.

Detective Wilson spoke to the responding officer, who told him that Cross was a potential suspect based on the complainants' descriptions. Detective Wilson learned that Cross had been arrested the day before with two other men.[3] He created photo arrays with photographs of Cross and the two other men. The arrays were shown to the three complainants. Webb identified Cross. None of the complainants identified the other two men. Detective Wilson obtained an arrest warrant for Cross.

Detective Wilson testified that within a day police arrested Cross.[4] Cross attempted to run from police. A search warrant revealed marijuana, a Hi-Point .45 pistol with two bullets, and a large amount of cash in Cross's car. The marijuana was in vacuum sealed bags, like those found in Diaz's bedroom. Cross had two

---

[3]     The two men arrested with Cross were not Ragsdale or Patterson.

[4]     Cross had been arrested the day before the robbery. He was not in custody when Detective Wilson began his investigation the next day.

10

cellphones with him. One of them belonged to Amua-Sekyi, who later opened it with his fingerprint.

At first, Cross refused to be interviewed by Detective Wilson. Later, Cross agreed to be interviewed in the jail. Cross admitted to Detective Wilson that he was part of the robbery and told Detective Wilson that someone named "Kedariyon Davis" participated in the robbery. He gave a description of Kedariyon and said he was from Mississippi. Detective Wilson spoke with Detective S. Fry with the Bryan Police Department and told him that Cross gave the name "Kedariyon Davis" as a participant in the robbery. Detective Fry informed Detective Wilson that "Kedariyon Davis" also went by "Kedariyon Ragsdale" and the nickname "KD." Detective Wilson created a photo array with Ragsdale's photograph and a photograph of another man known to be associated with him, Vincent Hawkins. The photo array was shown to Webb, Fulgencio, and Billi by another officer.[5] All three identified Ragsdale as one of the robbers. None of them identified Hawkins as part of the robbery. Detective Wilson obtained an arrest warrant for Ragsdale.

Detective Wilson learned from Detective Fry that sometimes Ragsdale associated with Kendrick Patterson. Detective Wilson placed Patterson's photo in an array and both Webb and Fulgencio identified him as the third robber. Detective

---

[5]     The officer who showed the photo arrays to the complainants was deceased by the time of trial.

Wilson obtained an arrest warrant for Patterson, who later pleaded guilty to aggravated robbery for his role in the incident.

Fulgencio testified that he attended Blinn College and lived in College Station with Amua-Sekyi and Webb in May 2016. The apartment complex assigned Diaz as their fourth roommate, but they did not spend time with Diaz. On the night of the robbery, Billi was staying with Fulgencio. They went to bed. In the middle of the night, Fulgencio heard a loud knocking and someone yelling for Diaz. Fulgencio did not get up because he did not know if Diaz was home or not. Later, when he heard glass shatter, Fulgencio got up with Webb and went to the front door. He saw a person he knew as Cross outside the apartment. Cross would hang out at the apartment with Diaz. When Fulgencio asked, Cross denied throwing a rock through the window and told them that he was looking for Diaz to "get some pressure." Fulgencio did not know what "pressure" was but thought he was talking about marijuana. Fulgencio was angry because he thought Cross threw the rock.

Fulgencio and Webb went back to their bedrooms. Fulgencio testified that later he heard much louder banging at the front door. He grabbed a steak knife and opened the front door. Cross was outside the door and told Fulgencio that someone was breaking into cars in the parking lot. When Fulgencio looked outside, two men with guns ran into the apartment. Cross put his foot in the door to keep Fulgencio from closing it. Fulgencio testified that he screamed, "No, no, no!"

Fulgencio testified that he remembered Patterson pointing a gun at him and Ragsdale screaming or yelling at him to find "the pressure." He testified that he was terrified and thought he would die. Fulgencio stated that Patterson was dark skinned, shorter, and wearing a black shirt. He identified Ragsdale as the bigger man with shorter dreadlocks who was wearing a white T-shirt during the robbery. When Fulgencio dropped against the wall, the man wearing a black shirt hit him with his gun. He then saw Ragsdale tear down Webb's door by hitting it repeatedly. Ragsdale took the door off its hinges. Webb was under the door, and Ragsdale was on top of the door. Fulgencio testified that Patterson went upstairs and brought Billi down in a chokehold. When Amua-Sekyi opened his bedroom door, he seemed frightened. Ragsdale pointed a gun at Amua-Sekyi and then punched him in the face.

Fulgencio testified that Patterson forced the three roommates upstairs. Ragsdale kicked down Diaz's upstairs bedroom door. Patterson pointed a gun at them and told them to open a safe in Diaz's closet. They could not open it because it required a fingerprint. The robbers then opened drawers and grabbed whatever they wanted in Diaz's room.

Fulgencio testified that Patterson let them know his gun was loaded by ejecting a bullet onto the ground and then putting it back in. Fulgencio testified that Ragsdale was "very aggressive." He stated that Ragsdale was big, like a football

13

defensive lineman. According to Fulgencio, "[Ragsdale] was bulldozing down the doors." Both Patterson and Ragsdale pointed guns at the three roommates and Billi.

After Billi and Amua-Sekyi ran out, Fulgencio saw Ragsdale leave the apartment while carrying an X-box and a jar of coins from Diaz's room. The police later arrived, and the roommates gave descriptions of their attackers. Amua-Sekyi had a knot on his forehead from being punched.

On the same day as the robbery, police showed Fulgencio a photo array. He identified the man shown on Photo 5 (Cross) as the man banging on the front door and yelling Diaz's name. A week later, law enforcement showed him another array. This time, he identified the man shown on Photo 3 (Ragsdale) as one of the robbers. He stated he was only 50 percent certain because the photos were only headshots, and he was unable to fully judge the size of the people in the photographs. He stated that the man shown on Photo 3 was the person who wore a white T-shirt and punched Amua-Sekyi in the face. About 10 days later, Fulgencio was shown a third array. In that array, he identified the man shown on Photo 4 (Patterson) as the man who was wearing a black shirt during the robbery. He was 60 percent certain of his identification. Fulgencio testified that, after the robbery, they never moved back into their apartment and left within a week.

**B.    Defense Witness**

Francina Darden testified for the defense. She stated that Ragsdale was her nephew and that Ragsdale's father was her brother. Ragsdale's father lived in Vicksburg, Mississippi, and, in May 2016, he was admitted to the hospital. Darden stated that Ragsdale visited his father in the hospital. The trial court admitted photographs taken on May 7, 2016 into evidence. One of the photos showed Ragsdale at the hospital. Darden testified that during that time, Ragsdale did not have a job or transportation. According to Darden, Ragsdale remained in Vicksburg until January 2017, when he moved back to Texas.

On cross-examination, Darden testified that she left Mississippi and moved back to Texas at the end of May 2016 because her children had final school exams in June 2016. She was not in Vicksburg and was not with Ragsdale on May 25, 2016. Darden testified that she only recently heard about the robbery and so she waited until the middle of trial to come forward with information. She also agreed that the hospital photos predated the offense. She testified that Ragsdale's mother lived in College Station and that Ragsdale had grown up there. She agreed that in May 2016, Ragsdale was a heavyset man with short dreadlocks.

The jury found Ragsdale guilty of aggravated robbery, and he appeals.

## Speedy Trial

In his first issue, Ragsdale argues that the trial court erred in denying his motion to dismiss the indictment due to lack of a speedy trial. We disagree.

### A.      Standard of Review and Governing Law

In all criminal prosecutions, both the state and federal constitutions guarantee the defendant the right to a speedy trial. *See* U.S. CONST. amend. VI; TEX. CONST. art. I., §10; *State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021). A speedy trial provides three protections to the defendant: freedom from oppressive pretrial incarceration, mitigation of the anxiety and concern accompanying public accusation, and avoidance of impairment to the defendant's defense. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).

In analyzing a speedy trial claim, we consider four factors: (1) the length of the delay; (2) the State's reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defense because of the length of delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016). The State bears the burden of justifying the length of delay, but the defendant bears the burden of proving his assertion of the right and prejudice resulting from the delay. *Cantu*, 253 S.W.3d at 280; *State v. Moreno*, 651 S.W.3d 399, 407 (Tex. App.—Houston [1st Dist.] 2022, no pet.). The defendant's burden on the latter two factors "varies inversely" with the State's degree of culpability for the

16

delay. *Cantu*, 253 S.W.3d at 280; *Moreno*, 651 S.W.3d at 407. "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Cantu*, 253 S.W.3d at 280–81.

The analysis under *Barker* is triggered by a delay that is unreasonable enough to be "presumptively prejudicial." *Barker*, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."); *see also Cantu*, 253 S.W.3d at 281; *Doggett v. United States*, 505 U.S. 642, 652 n.1 (1992) (noting that presumptive prejudice "does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry"). Courts have generally held that delays approaching one year are unreasonable enough. *Balderas*, 517 S.W.3d at 768; *Cantu*, 253 S.W.3d at 281. The extent to which the delay exceeds the minimum amount of time needed to trigger the analysis "factors into our assessment of the first *Barker* factor." *Balderas*, 517 S.W.3d at 768; *see Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (stating that because nearly four-year delay between arrest and trial "stretched far beyond the minimum needed to trigger the enquiry," delay length weighed heavily in favor of finding violation of right).

17

Once the *Barker* analysis is triggered, we must analyze the speedy trial claim by first weighing the strength of each factor and then balancing their relative weights considering the conduct of the prosecution and the defendant. *Cantu*, 253 S.W.3d at 281. No factor is necessary or sufficient to establish a violation of the speedy trial right. *Dragoo*, 96 S.W.3d at 313. The factors are related, and we must consider them together "along with any relevant circumstances." *Cantu*, 253 S.W.3d at 281. Because dismissing the charging instrument is a "radical remedy," we must apply the *Barker* test with "common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Id.* "The constitutional right is that of a speedy trial, not dismissal of the charges." *Id.*

We apply a bifurcated standard of review in addressing speedy trial claims. *Lopez*, 631 S.W.3d at 113–14. We give almost total deference to the trial court's historical fact findings that are supported by the record, and we draw reasonable inferences from those facts necessary to support the findings. *Balderas*, 517 S.W.3d at 767–68. When the trial court denies a speedy trial motion, we presume that the court resolved any disputed factual issues in favor of the State, and we defer to implied fact findings that are supported by the record. *Cantu*, 253 S.W.3d at 282. We should not consider record evidence that was not before the trial court when it made its ruling. *Balderas*, 517 S.W.3d at 768. Review of the individual *Barker*

18

factors necessarily involves both factual determinations and legal conclusions, but "the balancing test as a whole is a purely legal question that we review *de novo*." *Lopez*, 631 S.W.3d at 114; *Balderas*, 517 S.W.3d at 768.

**B.      Analysis of *Barker v. Wingo* Factors**

**1.      Length of delay**

The aggravated robbery occurred May 25, 2016. An arrest warrant was issued for Ragsdale on June 2, 2016, and the case was indicted on August 4, 2016. Ragsdale was arrested and released on bond on August 27, 2018. Trial commenced in February 2023. Both parties agree that a delay from indictment to trial of 6.5 years is enough to trigger the analysis under *Barker*. *See Balderas*, 517 S.W.3d at 768 ("In general, courts deem delay approaching one year to be unreasonable enough to trigger the *Barker* enquiry.") (quotations omitted). Because the delay "stretched far beyond the minimum needed to trigger the inquiry," this first factor "weighs heavily in favor of" finding that a violation of Ragsdale's speedy-trial right occurred. *See id.*; *Dragoo*, 96 S.W.3d at 314; *see also Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) ("[A]ny speedy trial analysis depends first upon whether the delay is more than 'ordinary'; if so, the longer the delay beyond that which is ordinary, the more prejudicial that delay is to the defendant."). This factor weighs against the State.

## 2.    Reason for the delay

We assign different weights to different reasons the State provides to justify the delay. *Balderas*, 517 S.W.3d at 768; *Dragoo*, 96 S.W.3d at 314; *Zamorano*, 84 S.W.3d at 649. "Some reasons are valid and serve to justify an appropriate delay." *Balderas*, 517 S.W.3d at 768; *see Gonzales*, 435 S.W.3d at 810 ("Unjustifiable reasons for delay count towards the 'length of delay,' while justifiable reasons for delay do not."); *Ussery v. State*, 596 S.W.3d 277, 285 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) ("A valid delay should not weigh against the State at all.") (quotations omitted).

On appeal, Ragsdale claims that the delay resulted from the State failing to arrest him sooner. The record reflects that Ragsdale was arrested in August 2018 and released on bond the same day. He remained on bond until convicted. Ragsdale cites to trial testimony suggesting he was residing in Mississippi at the time of the offense and remained in Mississippi until he returned to Texas in 2017. This evidence was not before the trial court when the trial court ruled on Ragsdale's motion, and we thus do not consider it as part of our *Barker* analysis. *See Balderas*, 517 S.W.3d at 768 (stating reviewing court does not consider evidence not before the trial court when it made its ruling).

Between January 2019 and January 2020, the court held seven status hearings. A final pretrial hearing was set on April 9, 2020, with jury trial scheduled for April

13, 2020. Both dates were cancelled due to the Covid-19 pandemic. Jury trials were either banned or restricted from spring 2020 through early 2021. *See e.g.*, *Seventeenth Emergency Order Regarding the Covid-19 State of Disaster*, 609 S.W.3d 119, 120 (Tex. 2020); *Thirty-Third Emergency Order Regarding the Covid-19 State of Disaster*, 629 S.W.3d 179, 179–80 (Tex. 2021). The Waco Court of Appeals, the appellate district from which this case was transferred to our Court, has held that delay resulting from the onset of the pandemic is not attributable to the State. *Gibson v. State*, No. 10-23-00131-CR, 2024 WL 976689, at *2 (Tex. App.—Waco Mar. 7, 2024, pet. ref'd) (mem. op., not designated for publication) (citing *State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.)).[6]

---

[6] Appellate courts have not reached a uniform conclusion over whether Covid-19 related delays weigh against the State, but courts reasoning that a Covid-19 delay weighs against the State have also concluded that it does not weigh heavily. *Martinez v. State*, No. 01-22-00390-CR, 2024 WL 2751393, at *21 (Tex. App.—Houston [1st Dist.] May 30, 2024, pet. ref'd) (mem. op., not designated for publication) (comparing *State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.) (holding delay does not weigh against the State), with *Laird v. State*, 691 S.W.3d 30, 40 (Tex. App.—Austin 2023, pet. ref'd) ("To the extent that the pandemic and related court closures weigh against the State, they do so but slightly.")).

"[T]he court of appeals to which [a] case is transferred must decide the case in accordance with the precedent of the transferor court under the principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3. While there may be conflict among the court of appeals on this issue, there is no conflict between our court and the Waco court. Our court in *Martinez* ultimately considered delay caused by the pandemic to be outside the control of all parties and did not weigh this delay against the State. *Martinez*, 2024 WL 2751393, at *21.

21

At the hearing on the speedy trial motion, the trial court stated that despite the Covid-19 delay, the case had been set for trial on three occasions in August 2021, May 2022, and September 2022, and neither side moved for continuances. On each trial setting, the State had sent witness subpoenas, indicating that it was planning to be ready for trial. The trial court stated on the record that the court had set special trial days to alleviate backup for cases where the defendant was not incarcerated pending trial, like Ragsdale's case. The trial court stated that on each of the dates Ragsdale's case had been set for trial in 2022, the case was not reached because the court tried older cases instead.

This factor does not weigh against the State.

### 3. Defendant's assertion of his right to speedy trial

The defendant "has no duty to bring himself to trial," but the defendant does have the responsibility to assert his right to a speedy trial. *Cantu*, 253 S.W.3d at 282. This factor is closely related to the other three *Barker* factors "because the strength of his efforts will be shaped by them," and "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id.* at 282–83 (quoting *Barker*, 407 U.S. at 531).

The defendant's lack of a timely demand for a speedy trial "indicates strongly that he did not really want one," and "inaction weighs more heavily against a violation the longer the delay becomes." *Balderas*, 517 S.W.3d at 771 (internal

quotation omitted). Moving for dismissal of the charging instrument instead of a speedy trial "will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Cantu*, 253 S.W.3d at 283.

Ragsdale was arrested and released on bond on August 27, 2018. Ragsdale did not make his motion to dismiss the indictment for failure to provide a speedy trial until the day before jury selection, February 26, 2023. He waited 4.5 years to request dismissal. There is no indication in the appellate record that Ragsdale asserted his speedy-trial right on any other occasion, and when he did make his speedy-trial claim, he moved to dismiss the indictment rather than to have a trial. This significantly weakens Ragsdale's speedy-trial claim, showing a "desire to have no trial instead of a speedy one." *Cantu*, 253 S.W.3d at 283; *see also State v. Moreno*, 651 S.W.3d 399, 415 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (holding that motion to dismiss filed seven years after indictment and one month before trial setting weighed against defendant in *Barker* analysis). We conclude that this factor weighs heavily against Ragsdale. *See Balderas*, 517 S.W.3d at 771; *Cantu*, 253 S.W.3d at 283.

### 4. Prejudice to defendant because of length of delay

We analyze the final *Barker* factor—prejudice—in light of what the speedy-trial right is designed to prevent: (1) oppressive pretrial incarceration; (2) a defendant's anxiety and concern; or (3) impairment of a defense. *Balderas*, 517

S.W.3d at 772. The defendant must show some prejudice, but he need not show actual prejudice. *Id.*; *see also Doggett*, 505 U.S. at 655–57 (noting that in absence of "excessive" bad faith or "excessive" negligent delay by the government, defendant usually must show "specific prejudice" to his defense.)

Ragsdale was released on bond pending trial, therefore the interest of preventing oppressive pretrial incarceration is not at issue in this case. Ragsdale also did not make any arguments regarding minimizing anxiety and concern of the accused. *See Balderas*, 517 S.W.3d at 772. His argument on appeal focuses primarily on the alleged impairment to his defense resulting from delay.

The last interest, impairment of a defense, "is the most important because the fairness of the entire criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Gonzales*, 435 S.W.3d at 812. In analyzing the role that excessive delay and presumptive prejudice play in the impairment of a defendant's ability to present a defense, "the length of delay may be so excessive that it 'presumptively compromises the reliability of a trial in ways that neither party can prove or identify.'" *Id.* (quoting *Shaw v. State*, 117 S.W.3d 883, 890 (Tex. Crim. App. 2003)). "In such instances, the defendant is absolved from the requirement to demonstrate prejudice." *Gonzales*, 435 S.W.3d at 812; *see Doggett*, 505 U.S. at 655–56 ("While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and

its importances increases with the length of delay.") (internal citation omitted). Nevertheless, the "presumption of prejudice is extenuated by the defendant's acquiescence in the delay." *Dragoo*, 96 S.W.3d at 315 (alterations and internal quotations omitted).

While Ragsdale argued that his ability to prepare a defense was impaired by the 6.5-year delay between indictment and trial, he offered no evidence of impairment in support of his motion to dismiss or at the hearing on the motion. A defendant must show that "lapses of memory" are in some way "significant to the outcome of the case." *Porter v. State*, 540 S.W.3d 178, 184 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (quoting *State v. Munoz*, 991 S.W.2d 818, 829 (Tex. Crim. App. 1999)). At the hearing, Ragsdale's counsel proffered that due to the passage of time, cell phones could not be located that would have helped to show that Ragsdale was not guilty. His counsel also said that Ragsdale had relatives in Mississippi who could have had "fresher memories."

Ragsdale argues on appeal that his witness, Francina Darden, would have had a clearer memory if the trial had occurred sooner and that she might have retained documents or photographs to support his alibi that he was in Mississippi at the time of the robbery. Darden provided generalized testimony at trial regarding why specific Mississippi witnesses, such as her mother, sisters, and brother (who is Ragsdale's father) were not available to testify at trial, but Darden did not testify

25

why these people would have been available at an earlier trial or suggest what their testimony would have been. Darden did not testify at the hearing on the motion for speedy trial, and her testimony was not before the trial court at the time it decided the motion. We may thus not consider the testimony. *See Balderas*, 517 S.W.3d at 768 (stating appellate court should not consider record evidence that was not before trial court when it made its ruling).

Ragsdale did not identify any specific problems due to faded memories or the delay, and he has not shown how any lapses of memory were in some way significant to the outcome of his case. *See McGregor v. State*, 394 S.W.3d 90, 116 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (defendant failed to demonstrate prejudice where he neither identified specific problems due to faded memories nor indicated how he was prejudiced by any witness's faded memories). Ragsdale did not state with specificity what evidence would have been on the cellphones he claims were no longer available. As *Barker* noted, "Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable, or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." 407 U.S. at 521.[7]

---

[7] We note that by the time of trial, Amua-Sekyi was unavailable to testify, and the officer who showed the complainants the photo arrays was deceased.

Ragsdale's claim that delay impaired his defense is also undercut by his role or acquiescence in the delay, the fact that he moved to dismiss the indictment rather than to start the trial, and the fact that he filed his motion only a day before trial commenced. *Dragoo*, 96 S.W.3d at 315; *Hopper v. State*, 520 S.W.3d 915, 929 (Tex. Crim. App. 2017) ("Any presumptive prejudice due to the passage of time was extenuated by appellant's acquiescence in the delay and even further extenuated by appellant's failure to employ a remedy that would have guaranteed him a speedy trial."); *Martinez*, 2024 WL 2751393, at *23–24 (concluding presumption of prejudice rebutted and defendant failed to demonstrate prejudice resulting from delay). We thus conclude that this factor does not weigh in favor of Ragsdale.

5.    **Balancing of factors**

A balancing of the *Barker* factors demonstrates that the trial court did not err in denying Ragsdale's motion to dismiss. The length of the delay, six years from indictment, and four years from Ragsdale's arrest, weighs heavily in favor of finding a speedy trial violation. Factors largely outside the control of both parties contributed to the delay. But ultimately, Ragsdale's delay in asserting his speedy-trial right and his failure to establish any specific impairment in his defense resulting from the delay weigh heavily against him. Ragsdale waited until the eve of trial to assert his right to a speedy trial, and when he did so, he sought a dismissal of the indictment against him. Ragsdale's acquiescence in the delay and his lack of particularized

evidence that his defense was compromised by the delay rebutted any presumptive prejudice caused by its length. Instead, he merely argued that evidence that might support his alibi was unavailable and that witnesses may have had clearer memories if the trial had occurred sooner. He presented no evidence of anxiety caused by the delay, and he was not incarcerated pending trial.

We balance the *Barker* factors with "common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Cantu*, 253 S.W.3d at 281. Upon balancing the *Barker* factors, we conclude that Ragsdale's right to a speedy trial was not violated. We hold that the trial court did not err by denying Ragsdale's motion to dismiss the indictment on speedy trial grounds.

We overrule Ragsdale's first issue.

## Sufficiency of the Evidence

Ragsdale next argues that the evidence is insufficient to support his conviction for aggravated robbery. We disagree.

## A.    Standard of Review

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We examine all the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact

28

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Gutierrez v. State*, 668 S.W.3d 46, 49 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). Our role is that of a due process safeguard, and we consider only whether the factfinder reached a rational decision. *See Morgan v. State*, 501 S.W.3d 84 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally") (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)); *Malbrough v. State*, 612 S.W.3d 537, 559 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

In a sufficiency review, we consider the "combined and cumulative force" of the circumstances pointing toward guilt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor," and "the standard of review on appeal is the same for both direct and circumstantial evidence cases." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (quoting *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). Thus, when performing an evidentiary sufficiency review, we may not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Gutierrez*, 668 S.W.3d at 50. A reviewing court, faced with a record of

historical facts supporting conflicting inferences, must presume that the trier of fact resolved any such conflict in favor of the prosecution and must defer to that resolution. *Jackson*, 443 U.S. at 326. When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006).

A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of the property. TEX. PENAL CODE § 31.03(a). A person commits robbery if, while committing a theft, and "with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02(a)(1)-(2). A person commits aggravated robbery when he commits robbery, and he uses or exhibits a deadly weapon. *See id.* § 29.03. A firearm is considered a deadly weapon. *See id.* § 1.07(a)(17)(A).

**B.    Analysis**

On appeal, Ragsdale argues that the evidence is insufficient to prove the identity element of the crime. He asserts that, without the pretrial and in-court identification evidence that he argues was improperly admitted, the remaining evidence does not support his conviction. But in conducting a sufficiency review, a

court considers all the evidence, including both properly and improperly admitted evidence. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

Considering the combined and cumulative force of all the evidence, as we must, the evidence was sufficient as to Ragsdale's identity as a participant in the robbery. Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). Proof by circumstantial evidence is equally as probative as proof by direct evidence, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011).

Cross testified during his plea and sentencing hearing that Ragsdale was one of two codefendants who pointed guns at the complainants and stole cash and drugs during the robbery. When Cross was arrested, a search of his vehicle recovered vacuum-packed marijuana, a pistol with two bullets, cash, and a cell phone. The cell phone belonged to Amua-Sekyi, who confirmed ownership by opening it with his fingerprint. Cross first provided Ragsdale's name to Detective Wilson. Detective Wilson then created a photo array with Ragsdale's photograph to present to the complainants.

In the weeks after the robbery, Webb identified Ragsdale in a photo array. Webb stated that he was 100 percent certain of his identification. Webb also identified Ragsdale in court during trial as the robber who broke his bedroom door

31

down and pointed a gun in his face. Webb recalled the robbery incident in detail and testified that Ragsdale threatened him and asked him where the "pressure" was in the apartment.

Shortly after the incident, Billi identified Ragsdale in a photo array as being one of the robbers. She stated that he was the "taller guy with the white shirt on." She stated she was 50 percent sure of her identification. She testified that Ragsdale pointed a gun at her and the other complainants. She recalled the robbery in detail, stating that she was brought downstairs in a chokehold by one of the robbers. She was scared that someone was going to die. She eventually ran out of the apartment with one of the roommates to get help.

Fulgencio identified Ragsdale in court as one of the robbers. He stated that Ragsdale was a big man wearing a white T-shirt during the robbery. Fulgencio saw Ragsdale break down Webb's bedroom door, taking it off its hinges. He saw Ragsdale on top of the door while Webb was underneath it. Fulgencio testified that Ragsdale pointed a gun at Amua-Sekyi and punched him in the face. Webb testified that he saw Ragsdale leave the apartment with an X-box and a jar of coins from Diaz's room. Fulgencio also identified Ragsdale in the photo array in 2016. He stated he was 50 percent sure of his identification, explaining that he needed to see the whole body, rather than a headshot, so he could judge the size of the person.

32

Francina Darden, Ragsdale's paternal aunt, testified that Ragsdale was in Mississippi at the time of the robbery. She said that Ragsdale's father was in the hospital in May 2016 and that Ragsdale remained in Vicksburg until he moved to Texas in January 2017. On cross-examination, she testified that she had left Mississippi by May 25, 2016 and was not with Ragsdale that day. The jury as factfinder could choose to disbelieve Darden's testimony that Ragsdale was in Mississippi at the time of the robbery. *See Estrella v. State*, 546 S.W.3d 789, 797 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (stating appellate court presumes the factfinder resolved any conflicts in the evidence).

Considering the cumulative force of all the evidence and deferring to the jury's role as sole judge of credibility, a rational factfinder could conclude beyond a reasonable doubt that Ragsdale committed aggravated robbery.

We overrule Ragsdale's issue related to sufficiency of the evidence.

**Identification**

In his next two issues, Ragsdale contends that, in violation of his constitutional rights to due process and due course of law, the trial court erred in denying his motion to suppress pretrial photo lineup identification and subsequent in-court identifications by witnesses. Ragsdale argues that the pretrial lineup identification procedure was impermissibly suggestive because he was the only person who closely resembled the description given by witnesses. Specifically, he

33

argues that the other men in the photo array have disparate weights from the description of the suspect, and each can be distinguished in some manner from Ragsdale's photograph. As to the in-court identifications, Ragsdale argues that the impermissibly suggestive pretrial lineup tainted the in-court identifications, and that the witnesses' identification of Ragsdale was based on their pretrial review of the photographic lineup rather than on their independent memory from the offense.

## A. Relevant Facts

At the pretrial hearing on appellant's motion to suppress the identifications, Detective R. Wilson of the College Station Police Department testified that he had been with the department for 32 years. He testified as to the way the photo array was compiled. He explained each time he puts together a photo array, he compiles six photographs and chooses where to put the photograph of the suspect in succession one through six. He then chooses five other pictures that match similarly and puts the array in a folder that has instructions to be read to witnesses by another officer. The photo arrays in this case were compiled in this manner.

Detective Wilson testified that the witnesses had described the suspect as being "six-foot, six-foot-one, 250 pounds, with short dreads." Detective Wilson interviewed co-suspect Cross, who named Ragsdale as a participant. Detective Wilson placed Ragsdale's latest booking photo in an array with photographs of five other people. The other photographs were old booking photos, and Detective Wilson

selected photos of people of similar age and features. He chose booking photos from people in Brazos County so that the backgrounds on the photographs would be the same as Ragsdale's photo. All photos were headshots, showing men from the shoulders up. The photographs are in black and white. Detective Ragsdale created three identical copies of the photo array to show to Fulgencio, Webb, and Billi.[8]

Another officer showed the photo array to the three witnesses in a parking lot in Katy, Texas in June 2016.[9] The officer who showed the photographs met with each witness individually in a car, where he showed them the photo lineup. Detective Wilson and the other witnesses remained outside. All three witnesses chose the photo of Ragsdale. Webb identified Ragsdale with 100 percent certainty. Fulgencio and Billi stated that they were 50 percent sure of their identifications. Detective Wilson testified that the lack of certainty was normal and not concerning. He stated that he would have been more concerned if the witnesses had chosen a different photo.

Webb testified at the pretrial hearing that he got a "good look" at the three suspects on the night of the offense. He was presented with multiple arrays on three different dates, and the officer who showed the arrays to him did not pressure him

---

[8]    The evidence included each of the photo arrays and audio recordings of the officer showing the array to each witness. The Department did not have body cameras in May 2016, so only audio of the procedure was recorded.

[9]    This officer was deceased by the time of trial.

or suggest a photo to choose. Webb testified that he was certain that Ragsdale, who he identified in the photograph, was one of the robbers. At the time he made the identification, Webb was 100 percent sure of his identification. Webb testified that around 2016, after he identified Ragsdale and other suspects, he was given the name of those suspects, and he looked up Ragsdale on the internet. He testified that it was "years and years ago." Webb further testified that his identification of Ragsdale was based on his memory, not on the fact that he had reviewed the photo arrays the day before in preparation for trial.

Before the jury, Webb identified Ragsdale in court as the robber who broke down his bedroom door. He testified that he would never forget Ragsdale's face after that moment. He testified that he had ample opportunity to view Ragsdale, including when Ragsdale pointed a gun at him, threatened him, and asked him where the "pressure" was in the apartment. He also saw Ragsdale beating up Amua-Sekyi, and he saw Ragsdale as he came in and out of bedrooms while Webb emptied drawers inside Diaz's room.

Fulgencio testified at the pretrial hearing and before the jury. At the hearing, he testified that the officer showed him multiple arrays while they sat in a car. In preparation for trial, Fulgencio had listened to the audio recording made when he viewed the photo arrays in the car in Katy, Texas. He identified the arrays as the

same ones he had been presented. He testified that the officer did not do anything to indicate which photograph Fulgencio should pick.

Later before the jury, Fulgencio testified that a "pretty big" black man with shorter dreads pointed a gun at him. Fulgencio testified that he was shown three different photo arrays by law enforcement. In the second array, he identified the photograph of the robber who wore a white T-shirt. He testified that when he made the identification, he told the detective and wrote on the array that he was 50 percent certain of his identification. He explained that the headshots did not allow him to fully evaluate the size of the individuals. Fulgencio identified Ragsdale in court as the man who had pointed a gun at him and "bulldozed" Webb's bedroom door. Fulgencio saw Ragsdale punch Amua-Sekyi in the face. He also identified Ragsdale in court as the same person he previously identified in the photo array.

Billi testified at the pretrial hearing that she had a decent look at all three suspects that came into the apartment on the night of the robbery. She was presented with multiple photo arrays of the suspects. She identified Ragsdale in an array in June 2016. At the time, she stated she was 50 percent sure of her identification. She testified that she picked the photo because the person in it looked familiar. The police officer did not pressure her in any way. Billi was not asked to identify Ragsdale before the jury. Before the jury, she identified the photo she had identified as

Ragsdale in an array in June 2016. She told the jury that the person in that photo had pointed a gun at her, Amua-Sekyi, Webb, and Fulgencio.

## B.     Standard of Review

We review a trial court's decision on a motion to suppress identification under an abuse of discretion standard. *See Villareal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Under this standard, we give almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor of witnesses. *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). We give the same amount of deference to the trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those questions turns on evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (internal quotations omitted). We review de novo "mixed questions of law and fact" that do not fall within this category. *Id.* When, as in this case, there are no written findings of fact in the record, we uphold the trial court's ruling on any theory of law applicable to the case and presume the trial court made implicit findings of fact in support of its ruling so long as those findings are supported by the record. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

When faced with a challenge to an out-of-court identification, a trial court considers the totality of the circumstances surrounding the identification to determine if a procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. *See Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1998). In the first step of this analysis, the trial court determines whether the identification procedure was impermissibly suggestive. *Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim. App. 1995). If the trial court determines that the identification is impermissibly suggestive, the court must consider the factors enumerated in *Neil v. Biggers* to determine whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *See id.* at 33–34 (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). Throughout this process, the burden remains on the movant to show impermissible suggestion and substantial likelihood of misidentification by clear and convincing evidence. *See Barley*, 906 S.W.2d at 33–34.

## C.    Analysis

### 1.    Pretrial identification

On appeal, Ragsdale contends that the content of the photo array made it impermissibly suggestive. He argues that Ragsdale was the only individual who closely resembled the description given by witnesses and that the extra photographs in the array were of men who could not "conceivably weigh 250 pounds."

Suggestiveness may be created by the manner the pretrial identification procedure is conducted. *Barley*, 906 S.W.2d at 33. For example, police may point out the suspect or suggest that a suspect is included in the photo array. *Id.* The content of the array itself may also show suggestiveness if the suspect is the only individual who closely resembles the pre-procedure description. *Id.* Furthermore, an individual procedure may be suggestive, or the cumulative effect of procedures may be suggestive. *Id.*

Ragsdale's argument focuses on the content of the array. In a pretrial identification procedure, while the better practice may be to use as many individuals as possible who fit the defendant's description, it is not essential that all the individuals be identical in appearance. *Cienfuegos v. State*, 113 S.W.3d 481, 492 (Tex. App.—Houston [1st Dist.] 2003, pet ref'd). "Neither due process nor common sense requires such exactitude." *Id.* While the individuals need not be identical in appearance to the defendant, their similarities in appearance should provide a reasonable test for the witness's capacity to reliably identify the perpetrator. *Id.*

Neither of Ragsdale's arguments demonstrate that the photo array was impermissibly suggestive. The record reflects that the photographs are of young adult African American men. They all have short-to-medium black hair in dreadlocks or twists and appear similar in age. All men are photographed from the shoulders up. Four of the six photographs are of men with light facial hair. While

their exact weights cannot be determined from a headshot, all the men are wearing casual civilian clothes, like T-shirts or a sweatshirt. The photographs are not greatly dissimilar in appearance from the suspect. *See Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (stating lineup is considered unduly suggestive if "other participants are *greatly* dissimilar in appearance" from suspect) (emphasis in original). From what can be seen in each headshot, the photographs do not depict men of greatly disparate height and weight, such that the lineup is impermissibly suggestive. *See Hosea v. State*, No. 01-02-00724-CR, 2004 WL 253259, at *2 (Tex. App.—Houston [1st Dist.] Feb. 12, 2004, no pet.) (mem. op., not designated for publication) (holding lineup with individuals of disparate heights and weights does not make identification procedure impermissibly suggestive when men dressed in similar clothes with similar complexion, hair color, hair style, and facial hair as defendant).

Having determined that the pretrial photo array was not impermissibly suggestive, we need not address the second prong of the analysis, i.e. whether under the circumstances it created a substantial likelihood of misidentification. *See Barley*, 906 S.W.2d at 34.

We hold that Ragsdale has not shown by clear and convincing evidence that the pretrial lineup procedure was impermissibly suggestive. Accordingly, we further

hold that the trial court did not err in denying Ragsdale's motion to suppress the pretrial lineup identifications.

### 2. In-Court Identification

Ragsdale next argues that the trial court should have excluded the in-court identifications made by Fulgencio and Webb[10] because the identifications resulted from an improperly suggestive pretrial identification procedure and because the in-court identifications were not reliable. Specifically, he argues that the witnesses' identifications were not based on independent memory but instead on their review of the lineup immediately before trial and therefore were fruit of the poisonous tree and should have been excluded. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (excluding evidence obtained from illegal arrest).

Ragsdale's argument that the in-court identifications should have been excluded as fruit of illegal government activity was not preserved for appellate review. Ragsdale did not object based on this doctrine during the hearing in the trial court. *See* TEX. R. APP. P. 33.1(a) (to preserve error for appeal, specific complaint must be presented to trial court). Moreover, the record does not reflect any argument that Ragsdale was illegally arrested, or that the in-court identifications about which he complains were tainted "fruit" of an illegal search, seizure, or detention. *See Bell v. State*, Nos. 01-04-00090-CR, 01-04-0091-CR, 2005 WL 1910810, at *2 (Tex.

---

[10]     Billi was not asked to identify Ragsdale in court.

42

App.—Houston [1st Dist.] Aug. 11, 2005, pet. ref'd) (mem. op., not designated for publication) (declining to apply fruit of poisonous tree doctrine because allegedly illegal arrest had no bearing on witnesses' identifications in video lineup). Thus, even if the issue had been preserved, we conclude that the fruit of the poisonous tree doctrine is not applicable in this case.

We have held that the pretrial identification procedure was not impermissibly suggestive, but even assuming that it was, Ragsdale has not met his burden to show that the procedure led to a substantial risk of irreparable misidentification. "An in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pretrial photographic identification." *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). In determining whether an impermissibly suggestive identification procedure gives rise to a substantial likelihood of irreparable misidentification, we weigh the following factors: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the witness's level of certainty regarding the identification; and (5) the length of time between the crime and the identification. *See Balderas*, 517 S.W.3d at 792 (naming *Biggers* factors).

Reliability is the "linchpin" in determining admissibility of identification testimony. *Nunez-Marquez v. State*, 501 S.W.3d 226, 237 (Tex. App.—Houston [1st Dist.] 2016, pet ref'd). Thus, even where the pretrial identification procedure is

impermissibly suggestive, "in-court testimony of an identification witness will still be admissible as long as the record clearly reveals that the witness'[s] prior observation of the accused was sufficient to serve as an independent origin for the in-court identification." *McGuire v. State*, 631 S.W.3d 222, 231 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (quoting *Jackson v. State*, 657 S.W.2d 123, 130 (Tex. Crim. App. 1983)); *see also Nunez-Marquez*, 501 S.W.3d at 237 (holding that even when pretrial identification procedure is impermissibly suggestive, identification testimony is still admissible if the indicia of reliability outweigh the suggestiveness, such that there is no substantial likelihood of irreparable misidentification).

The evidence reflects that both Fulgencio and Webb had a sufficient independent basis for their identifications of Ragsdale. *McGuire*, 631 S.W.3d at 231. Considering the first four *Biggers* factors, Webb testified that he would never forget Ragsdale's face after Ragsdale broke down his bedroom door. Ragsdale also pointed a gun at him. Webb watched Ragsdale punch his roommate and saw Ragsdale coming in and out of bedrooms during the robbery. Fulgencio identified Ragsdale in the courtroom, stating that he saw Ragsdale "bulldozing" doors during the robbery and that he was "so big, so aggressive."

Ragsdale focuses on the fifth *Biggers* factor on appeal. He argues that the reliability of the two witness's in-court identifications is lessened by the passage of

44

time between their identifications by photo array and the time of trial. Each witness identified Ragsdale in the photo array in June 2016. Trial began in 2023. This length of time does not detract from the reliability of each in-court identification. *See Thomas v. State*, 470 S.W.3d 577, 591–92 (Tex. App.—Houston [1st Dist.] 2015) *aff'd*, 505 S.W.3d 916 (Tex. Crim. App. 2016) (upholding admission of complainant's in-court identification that occurred nearly four-and-a-half years after the crime). Despite the passage of time, Webb and Fulgencio described the offense in detail and consistently displayed certainty that Ragsdale was the perpetrator of the offense. To the extent Ragsdale argues that the evidence is less probative because of the delay between the identification and the day of trial, the jury is the sole judge of the weight and credibility of the evidence. *Brooks*, 323 S.W.3d at 899.

Even assuming that the pretrial lineup was impermissibly suggestive, we conclude that under the totality of the circumstances, the identification procedure that preceded the in-court identifications did not give rise to a substantial likelihood of misidentification. The trial court did not err by admitting the in-court identification evidence.

We overrule Ragsdale's issues related to pretrial and in-court identifications.

## Conclusion

We affirm the judgment of the trial court.

Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Publish. TEX. R. APP. P. 47.2(b).